CLARENCE E. BENNETT, Plaintiff, *v.* SAMUEL PISCITELLO and Others, Defendants.

City Court of Rochester, Civil Branch, December 30, 1938.

*MacFarlane & Harris* [*William MacFarlane* and *Cyril L. Kendall* of counsel], for the plaintiff.

*Dwyer, Reilly, Roberts, McLouth & Dicker* [*John J. Reilly* and *Stephen V. Lines* of counsel], for the defendants.

TOMPKINS, J.   On August 5, 1936, the plaintiff offered in writing to install in defendants' macaroni plant a No. 3 AR 141 Ray oil burner and equipment to connect with defendants' then coal heating system.   The offer was accepted in writing by defendants on June 9, 1937.   Thereafter the burner was installed, the installation being completed about the middle of the following August.   The

agreed price was $1,240, one-half payable on completion and the balance in thirty days; $920 of the purchase price has been paid. This action is brought to recover the balance of $320. There is no controversy as to the foregoing facts.

The oil burner was used by the defendants for about one year, when they removed it, the plaintiff having failed to comply with their demand to take it out.

The defendants allege both as a defense and a counterclaim the breach of an express warranty as to the amount of oil the heater would consume, and they demand judgment in the sum of $2,795. The plaintiff did not reply, but relies on section 156 of the Justice Court Act, which provides that new matter in the answer is deemed controverted by " traverse or avoidance." Section 87 of the Municipal Court Code of New York City provides that the court in its discretion may order a reply. A reply certainly would have been proper in this case. We must assume the plaintiff meets these allegations of a breached warranty by " traverse or avoidance," or perhaps both.

The plaintiff's offer of August 5, 1936, at the bottom has the word " over." On the back are the words " Fuel Analysis." " On the supposition that your present full requirement of coal is 135 tons." This is followed by figures showing that 135 tons of coal has the same number of B. T. U.'s as 21,315 gallons of oil. " B. T. U." stands for British thermal unit.

The defendants urge that this statement was an express warranty that where 135 tons of coal had been sufficient for their plant, 21,315 gallons of oil, when burned in the oil heater plaintiff proposed to install, would do equally well.

Section 93 of the Personal Property Law defines an express warranty as an affirmation of fact by the seller relating to the goods, if its natural tendency is to induce the buyer to purchase, which he does, relying thereon.

This statement of the relative number of B. T. U.'s in oil and coal respectively, related to the efficiency of the oil heater which the plaintiff proposed to sell defendants, and install in their macaroni plant. Was the natural tendency of this affirmation an inducement to the defendants to buy the heater? The court so held on the trial when the defendants sought to show the prior discussion between the parties as to why they were induced to change from coal to oil. The plaintiff objected to its receipt on the ground that parol evidence might not be received to vary the terms of a written instrument. The court then ruled that if the plaintiff contended the language was ambiguous and did not warrant this construction, he might show by parol evidence how the statement

came to be inserted as a part of the contract. He did not accept the court's offer. He should be bound by the court's construction — unless the same is plainly erroneous.

The plaintiff proposed to install his oil burner, and so replace coal with oil as a heat producer. A statement as to the relative number of heat units of the two fuels could have been made with but one purpose, and that to show the superiority of oil as a fuel and thereby induce the defendants to install his oil burner. It is not only the logical conclusion, it is the only conclusion as to the reason of its incorporation in the offer. It was not a mere scientific conclusion announced to a group of scientists. It was the statement of a practical fact, made to a manufacturer to induce a sale. It was an express warranty that 21,315 gallons of oil burned in the oil heater which plaintiff proposed to install in defendants' plant, would have the same efficiency as 135 tons of coal burned in the furnace which the oil heater replaced.

Was there a breach of this express warranty? There is no controversy over the kind of coal used, or that No. 6 oil was not the proper oil. From the middle of August, 1936, to the middle of August, 1937, the defendants used 149 tons of coal. From the middle of August, 1937, to the middle of August, 1938, when they took out the oil heater, they used 30,229 gallons of oil. The mean temperature when coal was used was 49.2°, while when oil was burned, 48.9°. During the coal period, the defendants made 3,006,173 pounds of macaroni, while when oil was used they made 2,815,173 pounds, about 100 tons less. Using the ratio that 21,315 gallons of oil equal 135 tons of coal, then 149 tons of coal would equal 23,727 gallons of oil as a heat producer. They actually used 30,229 gallons, an excess of 6,502 gallons, or twenty-seven per cent.

The plaintiff asserts that the defendants' statement to the plaintiff, that 135 tons of coal was the amount they had previously used per year was untrue. It is not so proved. This statement was made prior to plaintiff's offer of August 5, 1936. The 149 tons were used between August, 1936, and August, 1937. Even if untrue, it was immaterial. The warranty was not as to the amount of oil which would be used, but was the ratio of B. T. U.'s of oil to coal.

The plaintiff urges that the fact that during the time oil was used, two thirty-six-inch fans were installed in the drying rooms, their use was a change of condition which released the plaintiff from this warranty. Their use, after installation, called for more heat. It nowhere appears, however, it had any effect upon the operation or effectiveness of the oil burner. The pertinent question is simply the increased amount of oil their use compelled.

When the fans were in operation with a lower temperature outside, it required oil to heat the cooler air. But how much? The fans were ready for use February eighth. There is no record of the periods they were used. The plaintiff is entitled to the benefit of any uncertainty he did not create. Prior to the fans' installation the air in the room where the macaroni was dried was changed by opening windows. How much air came through the windows does not appear. Sufficient, however, to give the same results accomplished by the fans. The fans were used from one to two hours at a time, whenever needed.

Charles Wiley, the city's heating expert, testified:

1. That one B. T. U. will raise fifty-five cubic feet of air one degree Fahrenheit.

2. That one thirty-six-inch fan, rotating 565 r. p. m., will take out 8,000 to 10,000 cubic feet of air per minute, and at 1,700 r. p. m., fifty per cent more.

3. That there are 152,000 B. T. U.'s in one gallon of No. 6 fuel oil.

Using these figures, two thirty-six-inch fans, rotating 1,700 r. p. m., would force out approximately 1,520,000 cubic feet of air per hour. The equation for determining how many gallons of oil will raise this volume of air 30° is as follows:

$$\frac{1,520,000 \quad x \quad 30}{152,000 \quad x \quad 55} = 5.49 \text{ gallons.}$$

To raise it twenty degrees requires three and six-tenths gallons; to raise it ten degrees requires one and eight-tenths gallons; to raise it five degrees requires nine-tenths of a gallon.

The temperature in the drying room is sixty-five degrees to seventy-five degrees, an average of seventy degrees. The average temperature outside, from February to August, was sixty-two and five-tenths degrees.

If we knew the exact number of hours the fans were used, the outside temperature at the time, and then knew how much air had previously come in through the open windows when used as ventilators, the problem would be easy. In lieu of this information, we must compare the amount of oil actually used with window ventilation with the amount used after the fans were installed.

|   | From | | To | | Days | Ventilation | Oil (Gals.) | Temperature |
|---|---|---|---|---|---|---|---|---|
| 1. | August | 16 | February | 7 | 174 | Windows | 16,479 | 52.7 |
|   | February | 8 | August | 16 | 190 | Fans | 14,000 | 62.5 |
| 2. | November | 2 | December | 31 | 60 | Windows | 7,245 | 34.2 |
|   | February | 7 | April | 8 | 60 | Fans | 7,710 | 33.7 |

From these figures it appears that during the 174 days the plant was operated with window ventilation, 16,479 gallons of oil were used, while during the 190 days with fans, 14,000 gallons were burned. That is, sixteen days less, and 2,475 gallons more oil. The temperature, however, was ten degrees higher.

In the two sixty-day periods where the outside temperature was almost identical, 455 more gallons of oil were used with the fans installed. We will assume this was occasioned by their use. The outside temperature for the two months was 33.7°; during the next two months the average temperature was 52°, 18° higher than the two months which increased the oil consumption 455 gallons. With a temperature of 52° the increased consumption must have been something less than 455 gallons. During the balance of the time the fans were used, the average outside temperature, day and night, was seventy degrees plus. The day temperature when the plant was operating was somewhat higher. The average temperature of the drying room was seventy degrees. Additional oil for heating was, therefore, unnecessary. The total allowance of 1,000 gallons of oil attributable to the use of the fans is certainly all that can be justified; at least 100 gallons too much.

The oil in excess of that guaranteed by the warranty was 6,502 gallons. From this, deduct 1,000 gallons attributable to the use of the fans, and there is still an excess of 5,502 gallons over the warranted amount of 23,727 gallons, or twenty-three per cent. This is a substantial amount. I find that there was a breach of plaintiff's express warranty that 21,315 gallons of oil consumed in the oil burner he proposed to install in defendants' macaroni plant would produce the same amount of heat as 135 tons of coal burned in the furnace he proposed to replace.

The buyer's remedies for breach of an express warranty are defined in section 150 of the Personal Property Law. The defendants have assumed to act under paragraph (d) of subdivision 1 of that section, commonly known as rescission. To invoke this remedy, the buyer must timely revoke, and return or offer to return the goods.

On both the 5th and 25th of August, 1938, the defendants made a formal written demand on the plaintiff to remove the oil heater. Just prior thereto, on August fourth, the plaintiff wrote: " If you desire to have the equipment removed and the stoker reinstalled, that will have to be regarded as a separate matter." In the same letter plaintiff demanded payment of the balance of the purchase price. The plaintiff did not comply with the defendants' demands to remove, so they took out the oil burner and reinstalled the coal stoker. They now hold the oil equipment for the benefit of the

plaintiff. The storage tank remains intact. While the written notice of rescission was made nearly a year after the burner's installation, the defendants in January, 1938, following its installation in August, called the plaintiff's attention to the large amount of oil being used, and the plaintiff replied, asking defendants to keep it for a year; to give it a fair trial. Plaintiff admitted this conversation. Defendants complied with this request, and then, about the end of the year, rescinded. Their action in view of the plaintiff's request, was timely. Furthermore, the warranty, itself, was based on a year's use. A fair test necessitated a trial for a substantial time under varied weather conditions. The final notices of rescission in August, 1938, were both timely and effective.

The defendants having timely rescinded on sufficient grounds, what are their recoverable damages? In their first counterclaim, after making the necessary allegations of warranty, reliance, breach, offer to return and demand for the purchase money they paid, they ask for $1,095; in their second counterclaim they repeat the principal allegations of the first counterclaim, alleging excessive consumption of oil, to their damage in the sum of $1,200; as a third counterclaim they repeat the principal allegations of the first counterclaim and then allege because of the failure of the equipment to operate " automatically," as warranted, they were damaged in the additional sum of $500. They conclude with a demand for an affirmative judgment for $2,795.

While there was established an express warranty that the equipment would work automatically, as alleged in the third counterclaim, the defendants failed to establish a substantial breach thereof. It is dismissed on the merits.

The defendants assert in their first counterclaim a rescission of the contract on which the plaintiff seeks to recover an unpaid balance of $320. They have established such rescission, with sufficient grounds therefor. Having elected to rescind, they are bound by their election. (*American Woolen Co.* v. *Samuelson,* 226 N. Y. 61, 66; *Merry Realty Co.* v. *Shamokin & Hollis R. E. Co.,* 230 id. 316, 325; *Johnson* v. *International Harvester Co., Inc.,* 237 App. Div. 778, 780.) Having rescinded and offered to return the goods, the defendant buyers are by section 150 of the Personal Property Law, subdivision 1, paragraph (d), entitled to recover such part of the purchase price as they may have paid, or the sum of $920 on their first counterclaim.

In their second counterclaim defendants allege a consumption of oil in excess of the amount guaranteed, and seek to recover herein therefor. The excess was at least 5,502 gallons as shown (*supra*), which at six cents per gallon amounts to $330.12. May that sum

be included with the amount they have paid on the purchase price? *Waldman Produce, Inc.*, v. *Frigidaire Corp.* (157 Misc. 438) supports defendants' contention that they may properly demand its inclusion. In the *Waldman* case there was a sale of a refrigerator warranted to maintain a certain temperature suitable to preserve fruits and vegetables. It failed to keep the required temperature and the fruit spoiled. The buyer rescinded. The appellate court held that the buyer might recover not only what it had paid on the purchase price but also the damage to the fruit it had lost. The learned Appellate Term arrived at the conclusion that the buyer was entitled to be placed in the position it was before it bought the refrigerator; that recovery for this damage really was not based on a breach of an express warranty, but rather founded on an implied agreement to make good a loss resulting from faulty refrigeration. "This implied agreement survived rescission" (p. 441). The court's theory seems to be that the rescission wiped out the contract *in toto* and, therefore, the express warranty. But implied promises are as much a part of a contract as are express warranties. If the rescission or cancellation of the contract destroys an express warranty as one of its members, how may an implied promise, another member, survive? Surely the implied has no greater vitality than the express. The fact is, it was the express warranty that the refrigerator would protect the fruit, whose breach gave two remedies; one, the right to rescind; the other, to sue for damages. The election of one excludes the other. Rescission wiped out the contract together with all obligations predicated thereon, both express and implied.

The learned court, evidently not wholly satisfied with the logic which led to its conclusion, seeks to fortify its position by citing thirty reported decisions in various jurisdictions and discusses some twenty of them. Not one of these construes section 150 of the Personal Property Law of this State. Several of these decisions are based on fraud. Of New York cases cited, *Ruben* v. *Lewis* (20 Misc. 583) and *Welch* v. *Seligman* (72 Hun, 138) were in fraud. *Newman* v. *Guaranty Trust Co.* (243 App. Div. 633) was an action against a third party whose deceit induced a contract. In *Tilton* v. *Schwarz* (199 App. Div. 607), an action based on rescission, there is no intimation the buyer may recover anything in addition to the amount paid on the purchase price. *Denivelle Co.* v. *Keil, Inc.* (140 N. Y. Supp. 150) apparently was an action, not for rescission, but for damages growing out of a breach of an express warranty, while in *Sorenson* v. *Keesey Hosiery Co.* (244 N. Y. 73) the court states (at p. 80): "The party who rescinds can claim nothing beyond restitution." None of these New York cases cited in the *Waldman* case supports the court's conclusion therein, that a buyer who

rescinds because of the breach of an express warranty may recover not only what he had paid on the contract price, but damages in addition thereto.

Even though the rescission is based on fraud, there is a most serious question whether damages in addition to the purchase price may be recovered. In *Merry Realty Co.* v. *Shamokin & Hollis R. E. Co.* (230 N. Y. 316), an action in equity for a rescission based on fraud, the Court of Appeals said (at p. 322) that there was no evidence to show that the rescission may not have been granted " together with damages to adjust the equities." Yet the same court in the later case of *Weigel* v. *Cook* (237 N. Y. 136), where the plaintiff likewise sued for a rescission based on fraud and recovered not only the purchase price paid, but also damages, struck out the damages, saying (at p. 142): " A buyer cannot, however, recover both damages and purchase price when a case has been tried on the basis of rescission." The *Weigel* case is referred to in the *Waldman* case at the bottom of page 445, and the decision is disposed of as follows: " The court did not discuss the question, merely citing some cases as authority for the proposition. * * * The cases cited * * * do not seem to support the text." We had supposed that the statement of a rule of law made by the Court of Appeals in announcing its decision is the law of the State, irrespective of the supporting force of its citations. None of the other twenty-odd cases considered or cited from other jurisdictions refer to the New York Sales Act, except that the last cited case, *Gerli & Co.* v. *Mistletoe Silk Mills* (80 N. J. L. 128; 76 A. 335), also cited in the *Weigel* case, refers to the New Jersey Sales Act, stating (at p. 129): " It is a logical consequence that where the purchase price has not been paid, the buyer's only remedy in the case of rescission is to withhold the price."

We do not feel that the conclusion reached by the court in the *Waldman* case is supported by a construction of the pertinent provisions of the Sales Act, nor by the New York cases cited therein.

When the rescission rests on a breach of warranty, the rights and duties of the parties are defined by and limited to those guaranteed in section 150 of the Personal Property Law. Section 150 grants and defines four remedies for the breach of a warranty. Two apply where the goods are accepted. One, when rejected. The fourth where the contract is rescinded. In the first remedy the damages are set up in recoupment on the unpaid purchase price. In the second and third the buyer may sue for damages. In the case of rescission he may " recover the price or any part thereof * * * paid." The buyer may chose his remedy, but having elected and been granted the remedy of his choice, " no other remedy can thereafter be granted." (§ 150, subd. 2.)

Prior to the adoption of the Sales Act in 1911, there was serious doubt that a breach of an express warranty could be followed by rescission and the recovery of the purchase price. (*Day* v. *Pool*, 52 N. Y. 416; *Fairbank Canning Co.* v. *Metzger*, 118 id. 260, 269; *Gelb* v. *Waller*, 115 N. Y. Supp. 201.) The right to rescind now rests upon section 150. The resultant rights of the rescinding buyer must now be found in the provisions of this section. Neither the common law nor the decisions by the courts of other States may add to what is here given.

A remedy in law is a privilege to do, coupled with the right to demand. When the remedy is statutory, and is clearly and unequivocally expressed, the court in applying it may neither subtract from its requirements nor add to its awards. It may construe and apply. It may not enlarge, no matter how just the addition. This is fundamental.

Section 150, subdivision 1, paragraph (d), is both clear and explicit. It provides that where the buyer has met the requirements of rescission, he may " recover the price or any part thereof which has been paid." This language needs neither clarification nor comment. It both creates and limits the seller's obligation. Yet, in the *Waldman* case (*supra*) the court added to its obligation by requiring the seller, in addition to returning the purchase price of the refrigerator, also to pay for the fruit it had spoiled, upon the theory of an implied promise brought into being by the breach of the very warranty which was the basis of the rescission upon which the action was founded. It is true that this additional obligation seemed to square with justice. It is true in the case at bar that the oil burned in excess of the warranty is a part of the direct damages. But in each of these cases these damages could have been recovered in the second remedy given under section 150, by keeping the goods and suing for all damages resulting from the breach of warranty. When the law creates or permits several remedies it may not be assumed that each will attain full compensation in all cases. It is because of the possible varying conditions that the several remedies are created, and a choice given. If a party does not elect the most favorable, he should blame himself, rather than condemn the law. The choice having been voluntarily made, the court must administer what has been selected. The defendants herein deliberately elected to rescind. They are thereby limited in their recovery to the amount they have paid on the purchase price.

The second counterclaim is dismissed on the merits.

Judgment on the first counterclaim in the sum of $920. The complaint is dismissed on the merits.